Good morning, Mr. Clutcher. You may proceed. Thank you. May it please the court, my name is Carl Clutcher and I'm appearing here today on behalf of the appellant here, Trafalgar House Construction, Inc. We're asking the court to reverse a May 2, 2007 judgment of the court's federal claims, denying all of Trafalgar House's claims and awarding the government a million dollars in principal on its counterclaim. And we're asking that judgment and the amount of $6.4 million be entered instead in favor of Trafalgar House. This case had its genesis in the Department of Labor's decision to relocate a Job Corps center that was in downtown Charleston, West Virginia, to a more campus-like setting that ended up being on a mountaintop area just outside the city limits of Charleston. The design for the project was like a small college campus. It had dormitories and other buildings and I think 11 buildings initially. When they went out and actually leveled the top of the mountain, they found that they could not fit all the buildings onto the site. But on the legal side, do you agree that it's up to you? Do you have anything to show that even the contractor had an indication in the contract that, you know, that's a special amount built? Yes. Do you agree with that, Mr. Sanders? It is the same. So what do you point to, or what is in the record that your witnesses or you pointed to in the contract that creates this, that satisfies this indication? It had a contour and elevation of the bedrock throughout the site. So it said, here is not just some core borings, there were core borings, but this is also a seismic study done that said, essentially, here is the elevation and the plane of the competent bedrock on the project. It also had, in the geotechnical reports, a very specific, and I mean very detailed, down to the percentage amount, of the amount of competent bedrock that would be found at those elevations and how much of that would be usable for this special rock fill, or SRF as it was termed from time to time. It also had, in the geotechnical reports, and it's only in the geotechnical reports, these side hill fills that were necessary to give this hilltop enough room to put all these buildings and construct this campus. It had, in those side hill fills, and there were seven of them for the entire site, a 15 acre site, it said, here are the elevations that the bedrock is going to be found. So you had something that said, here are the elevations that the bedrock is going to be found. If you're looking at the contract, you can't put anything in the contract other than the geotechnical report, and that seems to be the answer. Wasn't there a disclaimer in that report that says you can't rely on anything in this report to establish what the cost of construction will be? Yes, there was a limitation of liability provision with the geotechnical reports. Now, I would say, again, that the geotechnical reports, unlike most construction contracts, they were expressly incorporated into the contract. So they are a part of the contract. This is not something that's advisory. They were incorporated into the contract by express incorporation, and the side hill fills, which are the essence of this whole issue about the different site condition and the special rock fill that was used to construct it, that was the only place in the plans and specifications where any sort of description or drawing or anything that described those, either graphically or verbally, was included. So they had to be incorporated in the contract documents. That limitation of liability provision, and the trial court placed some, I think, undue emphasis on that, was essentially the content and purpose of that had nothing to do with the limitation of liability as it relates to and bears on the different site conditions. That was a disclaimer that said, from the sub-consultant who prepared the geotechnical study to the project design professional, look, I'm giving this to you, but it's for a limited purpose. We had expert testimony at trial that said that, from the person who prepares those types of reports, that said, that has never been used. The intent of that provision is never to limit the owner's liability on a different site conditions claim. We also, the language of the provision itself does not preclude recovery under the different site conditions claim. In fact, the limitation of liability provision, and it's in the volume one of the joint appendix of 1370, said it is prepared primarily to aid in the design of site work and structural foundations. That's exactly what was being done here. This involves exactly that, site work, the bulk of this claim relates to site work, and structural foundations. And it says, the information in the report is expected to be sufficient for these purposes. It goes on to say, it is not intended to determine the cost of construction or stand-alone construction specification. But it's saying, here is this information, it's designed for exactly the reason for which the contractor, Utrafiber House, and its subcontractor used it, and it's expected to be sufficient for those purposes. It does also mention that there's going to be variations in the soils. It says, soil variations may exist between boardings, and these variations may not become evident until construction. This claim has nothing to do with soils. The contract documents define soil as something totally different than rock, which is self-evident. They actually had definitions of each of those materials. It had a definition of soils, it had a definition of rock, and it had a definition of the material that was suitable for use in a special rock field. So, this limitation of liability provision doesn't really address at all, or preclude, usage of the references related to bedrock and competency of rock for purposes of construction, or for use as a basis for contract indications sufficient to justify a finding that there was a type one different site condition. The contractors here had no choice. They were given these reports, said these are part of the construction documents, and they had to be used as construction documents, because there was nowhere else, literally nowhere else in the three volumes of plans and specifications for the project where the side hill fields, which were the essential part of the construction, the buildings are literally founded on these side hill fields, there was no other place to go to describe how to construct. So, yes, there are ample indications. When you read all those reports, and you read the documents, the concern, and this is the irony of this case, the concern was not that there would not be enough special rock field or competent bedrock material. It was exactly the opposite. They were so concerned that the rock here, and you'll see reference after reference to bedrock, very shallow. They were concerned that they were not even going to be able, without blasting and special techniques, to get the water lines, electrical lines, other utility lines in without blasting. That was the concern that they had. Just on the slide up here, I mean, who determined the site? The park manager. And they could have done a lot of different things, but that's neither here nor there. They could have just cut the site down, and they had a bigger site. Before your time runs out, let me ask you about a sort of side issue, particularly, I'm sure, from your point of view, which is if we agree with the trial court that you can't use the total cost methodology, then I guess I would agree with your leftist argument about whether or not you can entitle it to at least a portion of the million dollars that you got out of it. By and large, that's true. I mean, we use the modified total cost methodology for the bulk of the claim, and we think it's perfectly justified. But, yeah. But why was it just reported? But you take issue with the court of claims judge, who then determines you're not entitled to it. You presented one methodology for determining damages, the total cost. You lost on that. Assuming we agree with her and she was correct, you should have lost on that. What claim can you possibly be left with to try to get back that $450,000 out of the note? The trial court, the government, put on two witnesses, John Steenbergen, the contracting officer, and they had a consultant, a gentleman by the name of John Tire. Both testified that, in essence, that Trafalgar House was entitled to approximately half a million dollars. There was some variation between the two. Steenbergen testified that Trafalgar House was entitled to $450,000. Yeah, but you never asked. You didn't say you want total cost, but in the alternative, if he moves on that, we think there's a sufficient damage calculation that's been done for purposes of the record for us to at least retain that portion to which the government's witnesses put evidence. I mean, you never – is there anything in the record? Well, we took that – well, obviously, at the trial, we're going to go for the appropriate amount of damages that we thought, and we thought that that was nowhere near justified. No, I understand. In your theory that the total cost methodology was the appropriate methodology would have been significantly undercut had we fled an alternate claim for, you know, we can't itemize, therefore, total cost methodology is appropriate, but alternatively, if you don't believe us on that, we are itemizing and submitting. Yeah, here's – yes, that's one of those alternative situations that you just can't have. It's sort of mutually exclusive. But you're trying to have it not. I mean, but I understand the tactical decisions lawyers must make, but that's exactly what you're arguing to us now. What I'm arguing to you now is that there was no evidence that the court below was faced with a situation where the government itself, tantamount to an admission, says we have determined that you can use unit cost, and we did an analysis, and we've prepared a report specifically, and we are presenting to this court on our counterclaim, which is their burden to bear on that, that Trafalgar House is entitled to approximately half a million dollars back. So our position in the brief, we're not inconsistent. We're saying we believe the modified total cost methodology is appropriate. The government then puts on a counterclaim, and the evidence that they adduce at trial to support their counterclaim to witnesses, both of whom says we conclude and we testify that – No, I don't know. Is that the way it went down? Because the government – that wasn't the testimony. The government was using – I thought when they amended its claim to try to get back that money, what they said is based on the judge's decision that, you know, you're not entitled to any changes because you didn't prove anything out there under the total cost, that they were entitled to that. I don't think they were, for purposes of getting the 600 back or whatever, they were saying rely on our evidence. Well, they actually put the two witnesses on it. But that was before the – at trial. Yeah, that was when they were claiming a partial recovery, and then subsequently the counterclaim was amended, and they said, well, in light of the failure of the total cost methodology, we're amending our claim because we're entitled fully to it. No. Actually, at the trial, they actually took – their pleadings initially was they were entitled to the entirety of the million dollars back, and then they put on the two witnesses that said half a million dollars, roughly, and variation came in. Yes, that's exactly what they did. They always – the amendment – Okay, so what was your answer to that during the trial? Did you put on anyone to say no, they're not entitled to any of that, other than your general claim that dealt with the total cost methodology? No, no. What we had the evidence at trial at that point was we just confirmed that that was their testimony, and I think our strategy at that point was, at the very least, they shouldn't get any money back. I mean, their testimony and evidence, we were willing to accept the testimony that if we lost everything, that at least on their counterclaim, we would at least keep half a million dollars. But we didn't try to counter that in any way at the trial. We didn't put on any rebuttal or sort of rebuttal-type testimony to their counterclaim that said, well, it should be something different than that. Was there any question that the million dollars was a loan or an advance in my opinion? It was an advance on what were perceived to be legitimate claims. I mean, there's no real documentation. As I recall, there's nothing that says this is a change in order or anything. It's not payment on the project. Yes, it was definitely for the claims. All right. We've used up all of your time. We're going to restore three minutes for rebuttal. Thank you. Governor of the District of Canada. Good morning. Good morning. May it please the Court. The Fowler House failed before the Court of Federal Claims to prove its different site condition claim, to prove its delay claim, and to prove its damages. Do you agree that the geotechnical report was part of the contract? Yes, we don't disagree with that. All right. So why would – I mean, do you disagree with his view of the other side's view of the substance of what that said or just the inform of that with respect to the indication issue? I think both really. I think what Trafalgar has done is they've mischaracterized what it says, and they've also asked the Court to take the view that you can look at the language in the contract and that Trafalgar was entitled to extrapolate its own conclusions from that language, and neither of those is correct. Under Weeks, the Court said that you have to look at, quote, reasonably plain, concise, unambiguous, and unequivocal language, and there clearly is no unambiguous or unequivocal representation as to the subsurface contents of this project site. But they did have testimony that an expert or whatever that said that this is the waste of a reasonable contract that would construe the site, right? That's right. And did the Court have any testimony that that was not – I mean, is there other testimony that it was at best ambiguous, that it was not being properly construed by their experts? Well, there was testimony that it simply wasn't an indication of what the subsurface contents were. And I can walk you through that, actually. I think it would be probably most helpful to look at particular documents. If you look at the administrative record at page 1369, this is the portion of the geotechnical report that is cited most frequently by Chisalgo. And the language that they're relying on is under the heading Task 5, Additional Rock Core Nature of Bedrock at Core Locations. This is the 76% language that they continuously rely on. And the way it reads is, the combined results for supplemental and original rock – No, I can read it. Okay. So your read of this language – Well, there are two – well, there are really three points here. First, this language relates to the composition at bedrock in each of these borehives. Not before you get to bedrock. And if you look in the administrative record at – Also discussing like quantity of material. It may reflect characteristics, but not necessarily quantities. Well, what your founder is saying is that this amounts to a representation that 76% of the project site, I think is what they would like to report and believe, is composed of material that is suitable for special rock flow. But that's simply not the case. What this says is that programs indicate that competent bedrock at core locations. Those are the two key points. First, we're talking about competent bedrock. And if you look at page 1433 in the administrative record, you can see – and in subsequent pages, you can see the actual boring data. And I think 1433 is a particularly good example. If you look at each of those rectangles, those sort of downward pointing rectangles, is a boring. And if you look on each of those, there is a line below which is a series of Xs. That's the bedrock. So what this statement is saying is that 76% of what's below the bedrock is suitable for special rock flow. But if you look up, there's a longer dotted line below the number 1145. And it's labeled finish floor elevation. See that? The number is 1143.5. That's actually the level at which the plans called for excavation down to. So in other words, the excavation is only going to go to the finish floor. And it's clear from these diagrams that they weren't actually going to excavate down to the bedrock, which is what this representation relates to. So that's the first point, that there is no representation about anything other than the bedrock. Secondly, this representation relates only to the poured locations. There's no indication of what the conditions are like in between the poured locations. And in that way, this case is very similar to weeds. Thirdly, there's no representation that whatever amount is down there is going to be sufficient for the purposes of meeting special rock flow requirements at this project site. It simply does not say that. It simply says what the percentages of bedrock at the poured locations. So clearly, there is no reasonably plain, concise, unambiguous, and unequivocal language as required by the weeds. Now, Trafalgar has argued as an alternative that the court should apply a reasonable contractor standard, or what a reasonable contractor would extrapolate from the language of the contract. But there is no requirement for a reasonable contractor standard in weeds. The language relating to reasonableness of the contractor in weeds is really saying that you have to look at how a reasonable contractor would understand the language. In other words, would a reasonable contractor find that there was a reasonably plain, concise, unambiguous, and unequivocal indication of what the conditions are? Not would a reasonable contractor take that information and draw all sorts of other conclusions from whatever statements there are in the contract. But nonetheless, that's what Trafalgar is asking the court to do. It's even more unreasonable in these circumstances because the contract contained or incorporated Part Provision 52.236-3, which reads, the government assumes no responsibility for any conclusions or interpretations made by the contractor based on information made available by the government. So the government is explicitly saying in the contract, we're not, we make no representations as to what conclusions, you know, the conclusions that you draw with respect to the data that we're giving you. I think Trafalgar's reading would also render the third problem of the different site condition claim. Redundant. Third problem relates to whether the contractor reasonably relied on the information that was provided. And so if you graft a reasonableness requirement onto the indication problem of that test, then there's no reason for, to determine whether a reasonable, I'm sorry, whether the contractor reasonably relied on the third portion of that test. It would simply, in effect, read out the third problem of that test. But even if you apply a reasonable contractor standard, as Trafalgar has asked you to do, it simply wasn't reasonable for Trafalgar to draw the conclusions that it drew from the data that it was given. And in fact, the Court of Federal Claims specifically held that, quote, it was unreasonable for THC to extrapolate from H.C. Dunning's analysis of the rock core samples, i.e., because 76% of the bedrock at poor locations may have been suitable for the use of special rock fill. 76% of the bedrock over the entire site was also usable as special rock fill. So the Court of Federal Claims drew a conclusion on that point. And that determination is, in fact, and therefore subject to clear error review, which Trafalgar has not shown clear error. Before you run out of time, let me ask you about that sub-issue with regard to damages that were $500,000 that we were talking about before earlier. Yes. The government concedes, does it not, that Trafalgar suffered some damages that were resulting in these damages? No. What our experts, what the expert and the contracting officer testified with respect to, is their testimony related to whether or not it was possible to do a unit cost analysis. And in that context, they referred to the calculations they had done in the context of Trafalgar's request for equitable adjustment. But in doing those calculations, they relied on the information that was in Trafalgar's request for equitable adjustment. But there's no question that the government concedes at least that there's some liability, not necessarily the amount of damages, but some, that there was a basis for an equitable adjustment of some sort. That actually was not decided by the Court of Federal Claims, and I don't know that we're ready to concede that now. The Court of Federal Claims went directly to the damages issue, so I don't know. I thought it was on the test. And you put the contracting officer on, right? That's right. And the contracting officer had reached a certain conclusion, and that was that the bedrock was lower, blah, blah, blah, or $241,000 that DOI was liable for $4,100 for resulting delays, and blah, blah, blah. Isn't that, if that's the government witness and they're saying, isn't that a concession of liability with respect to those amounts? No, because all that springs from the evidence in Trafalgar's request for equitable adjustment. And the same evidence was not put on at trial. In other words, Trafalgar itself had done a unit cost analysis. And based on – that was in its request for equitable adjustment. And that's what the contracting officer and the government's expert used. They basically took the numbers that were in the REA and did their own calculations based on those numbers. But there wasn't proof in the record of – at trial of the facts underlying their claims in the REA because they never went back to the unit cost analysis. So – Why didn't the government put this on? Was the government putting this on to show that you could do a unit cost analysis so that the total cost was not the right measure of damages? That's right. Is that why this battle went on? That's right. That's right. That's right. Right? I believe it was on that basis. I can't say for certain exactly what the sequence of events was. But that is my understanding. But don't you think this should apply to some sort of fairness standard? That they came to trial and they – particularly given your witnesses, I mean, they could have reasonably thought – could they know that the government had already conceded liability up to at least $500,000 or whatever so they didn't have to put on a case with respect to that amount in the alternative? Well, certainly that's something they could have established through discovery or they could have established through a stipulation prior to trial. And there's no evidence that that is the case. But you're saying they could have discovered it through discovery. I mean, there was a record in the case. And the only record with respect to liability or damages with respect to this discrete issue was the unconfirmed written testimony of the government, which is this is what we owe you for this much. Assuming that your numbers are correct. Of course. The REA numbers. Isn't this a burden of proof question? Well, you filed a counterclaim for the lesser amount of money. You got full amount. And don't you have a burden of proof to show that you're entitled to that money back? No, I don't. Because I understand what you're saying. You really presented an uproar in your counterclaim. Well, really your father has the burden of proof on the issue of damages. Counterclaim? Well, on the issue of damages, really the counterclaim. You're trying to get your money back. That's right. And the government had the burden of proof to show that the nature of the $1 million payment was, in fact, in advance on any amount to request for equitable adjustment. But there was no dispute about that. That fact was never questioned. Do you think that's all you had to show? I believe that's all the burden, the only burden on the government was to show that. Because the issue of the amount of damages owed to Trafalgar was a separate issue. Yeah, but the failure proof that Trafalgar had on its case doesn't necessarily have a major case on it. You have a burden of proof on your case. In this case, it necessarily does. I mean, our counterclaim was strictly, in effect, an accounting issue. There's still a counterclaim and a burden of proof. Pardon? It's still a counterclaim, and you had the burden of proof. That's right. We had the burden of proof to show that we were entitled to a return of some money after Trafalgar failed to meet its burden of proof to prove damages. And did you? That's my question. And again, that issue— Did you really say that there was no proof on the counterclaim at all? Well, the issue is whether that's the nature of the payment. You say that $500,000 was not proof. All you have is that the court found that Trafalgar didn't carry its fair amount of damages. Didn't offer any damages. Didn't carry its burden, doesn't mean you don't have a burden on the counterclaim. That's right. And there are really two issues that relate to the counterclaim. First is the issue of whether Trafalgar is entitled to any damages. And then the second issue is whether the million-dollar payment to Trafalgar was in the nature of an advance or at least some other type of payment. The issue of whether Trafalgar is entitled to any damages is an issue in which they have the burden of proof. But the issue as to whether the payment was a million-dollar advance is something the government would have burden of proof with respect to whether it's a counterclaim. You say your only burden on the counterclaim is the burden of this advance amount of payment? That's right. That's right. Because you're saying that this money was just up for grabs because it's an advance. So it was part of their overall burden. They wanted anything to show it. And that's right. And if they wanted to keep the money under the advance, they had to prove their damages at trial. And their failure to do that meant that they weren't entitled to any damages. Now, that having been established, in order for the government to reclaim that million dollars, it simply had to show that the million dollars wasn't an advance against any amounts that were eventually owed as a result of the request for equitable adjustment or the lawsuit. Did they use these issues of the CEO and the expert as their proof of damages? Well, certainly they can't use the contract. You had the burden of going for the counterclaim. You did. You said, I'll show you the advance. And they have a proof there of your damages and have an admission. But again, that admission was based on evidence that wasn't in it. I mean, in fact, what the contracting officer and the government's expert were asked to do at trial is to provide a calculation, assuming that Trafalgar's numbers submitted as part of the request for equitable adjustment were correct. Well, in a normal setting where you don't have a total cost methodology claim, you have one party comes in and says the other party owes me $7 million. And then the other side says, well, no, no, no, it's not 7. It's no more than a half a million. But usually the resolution is somewhere between those two. And if the party doesn't prove 7, at least they're entitled to get to half a million, not to go back to zero. But I don't think it's true, actually. I think if the other party comes to court and fails to prove any of its damages, then it's not entitled to anything. And certainly in the context of a settlement discussion. So where there's a sort of concession that the damages may not be 7, they're no more than a half a million. That concession usually establishes the floor, and a resolution would be something between those two limits. Here, there seems to be no dispute that there was some different site condition that warranted some amounts of some sort. And the contracting officer came up with a half a million dollars. Now, the parties didn't agree on that number because the contractor claimed that it was greater than that. And the contractor then submits a total cost methodology claim and doesn't hire a person. But nonetheless, testimony is there that the contracting officer concedes there's a different site condition. And submits some basis to conclude that the amount of money involved is about a half a million dollars. And why is it appropriate for the government to get a bond and come away with a full recovery? Because really, and I see other times it expires. Because really, the nature of the contracting officer's testimony at trial and the government's expert's testimony at trial sprung from the assumption that Trafalgar was able to prove its unit cost damages. In other words, its unit cost assertion in its request for equitable adjustment was assumed to have been correct for those purposes. But they failed to prove that at trial. So… Well, on their claim, on their claim, they failed to prove it because they picked the wrong method of proving damages. That's all. But the fact remains that $500,000 remains proved by itemizing it. But only if you assume that their claims in their request for equitable adjustment were accurate. In other words, the government didn't make any effort to verify that those costs were actual costs. You haven't challenged them. That's your burden, isn't it? If you don't think their CEO and their expert are right, you should have challenged them. Show them where they're wrong. That's Trafalgar's burden, however, to show their damages. You're trying to get money back. Right. But I think in order to do that, we only need to show a much more limited – the burden in the first place is on Trafalgar to show that they're entitled to damages at all. That's right. That's right. All right. All right. Thank you very much. Thank you. Let's see your focus for our lecture. Thank you. Thank you for the additional few minutes. They did address – they did take up several issues at trial. They did have an expert that talked about reasonableness of the contract indications. But he used – this was Mr. McConnell – and he used the same sort of overly restrictive definition that the trial court used, which was in the absence of an express representation that no special rock filter needed to be imported or an express representation of the quantity to be found on site or to be used in the construction of the side mill fields, that there is no such thing as a contract indication. And that's – the case law, including the Weeks dredging case, do not say that. They've never said that. It's never been the position of this court or the Court of Federal Claims. It's a reasonable interpretation, and the case law says repeatedly it does not need to be expressed or explicit. And that informs, by the nature of that definition, that you're going to have to look at what's there and perhaps have some interpretive background. It's the reasonableness of that interpretation that's at issue. You look at the Weeks dredging case, which the trial court relied on fairly heavily and the government definitely relied on heavily in their briefing, and that case is really legally and factually the opposite. In that case, it was a river dredging case or a body of water dredging. I believe it was a river. Most of the core locations were outside the work zone, and the contractor extrapolated, made the assumption that the court said it was unwarranted, that the conditions in one borehole were the same halfway to the next borehole. Here, the big distinction is, and the counsel ignored in their argument and in their briefing, is that not only did we have these quarry locations that said, here's the composition of materials, and there was no evidence off in the trial that that was inaccurate. The fact of the testimony was that those were accurate. The 76% representations were accurate. They were accurate as to the composition of the material, sandstone and siltstone. We had that bedrock, the seismic study that says, we didn't have to extrapolate from one borehole to the other. We had a seismic study that says, here is the way the competent bedrock reads underneath the site. So we had a prediction of, here's what, you didn't have to extrapolate from borehole. It said, here's where the competent bedrock, that's what a seismic study does. So we didn't have the issue they had there. Also, all the quarry locations on, in this case, were within the work zone of the site. In weeks, all but 13 of the 156 taken were outside of the work area. So the courts there said, look, you made unreasonable assumptions. You extrapolated from borehole to borehole. There was no basis for doing that. And most of them were outside the work zone, totally unlike what's here. The citation to the appendix with respect to the quarry locations and the finished floor elevations, the council said, well, we weren't even going to get down to that. Well, the finished floor elevation is not the elevation of excavation. That's the elevation of the finished floor. You excavate significantly below that. So you would be getting into the bedrock. And that, he picked up one particularly egregious example. There were many of them that showed that you were going to be in the bedrock area. You were going to be doing that. And there was no indication, and that government put on no evidence of trial, that the reason that there was, the contractor did not find enough special rock material that had anything at all to do with their misreading of the quarry, whether in terms of where the bedrock would be located or that they misinterpreted what the quarry rock represented. And, in fact, remember, the side hill pillar excavations, the drawings that show those actually have the elevations where they tie into those elevations. Now, with respect to the government's counterclaim, forgive me about the time on that, the evidence that was offered at trial had nothing to do with, well, we're looking at what the REA said and based on those assumptions. McTire, their expert, had prepared a report one month before trial, August of 2005. The trial was in the first week of September 2005. And he said in there, I'm looking at fresh look. It wasn't, well, do we justify the request for equitable adjustment? He's doing it as any expert would do. What is the contractor entitled to on its counterclaim? Or what is the contractor entitled to on the two of the three claims that we found liability for? And one of the facts that's been overlooked here is that there were three separate types of different, they're all different types and different sections of the thing, but three separate claims. The government conceded liability on two of the three. So they were putting a damage figure on two of those three claims. It said we come up with 500-some thousand dollars' worth. That's a different number that was in the REA. So it wasn't anything to do with that. All right. Thank you. Your time has expired. Thank both of you.